**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LESLIE ALLISON SIMS, et al.,** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | |
| **v.** | ] | **2:14-cv-00878-KOB** |
| | ] | |
| **CLIFFS RESOURCES, INC., et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

The 14 plaintiffs own homes and real property in Bessemer, Alabama.  Between late 2013 and sometime in 2014, Oak Grove Mine conducted longwall mining, a form of underground coal mining, near Plaintiffs' homes.  That mining caused subsidence, defined as "[t]he gradual caving in or sinking of an area of land," *Subsidence*, Oxford Living Dictionary, https://en.oxforddictionaries.com/definition/subsidence (last visited September 6, 2017).  Not surprisingly, the subsidence damaged Plaintiffs' homes and real property.

Plaintiffs sued a number of entities associated with the mine, but the only remaining defendants are Oak Grove Resources, LLC, and Cliffs Resources, Inc.  Oak Grove owned and operated (and continues to own and operate) Oak Grove Mine under a permit issued by the Alabama Surface Mining Commission.  At the time of the mining that damaged Plaintiffs' homes, Cliffs owned Oak Grove.  Plaintiffs assert that Oak Grove is liable for negligence/strict liability; wanton, intentional, and willful conduct; nuisance; trespass; and fraud, deceit, and

1

suppression of material fact. Plaintiffs claim that Cliffs, as the former owner of Oak Grove, is liable for wanton, intentional, and willful conduct.

In an earlier order, this court described the statutory and regulatory framework governing claims arising from mining-related subsidence damage to residential structures. *See* (Doc. 57). The Alabama Surface Mining Control and Reclamation Act of 1981 ("ASMCRA"), Alabama Code § 9-16-70 *et seq.*, provides the remedy to property owners for subsidence damage caused by underground mining.

Subsection 9-16-91(e) requires underground coal mining operations to "[p]romptly repair or compensate for material damage to any occupied residential dwelling and related structures . . . resulting from underground coal mining operations." *Id.* § 9-16-91(e)(1). And Alabama's mining regulations provide that the mining permittee is responsible for providing that repair or compensation. *See* Ala. Admin. Code § 880-X-10D-.58(3)(b) ("The permittee must promptly repair, or compensate the owner for, material damage resulting from subsidence caused to any non-commercial building or occupied residential dwelling or structure related thereto that existed at the time of mining."); *see also* (Doc. 57 at 6–7). In addition, ASMCRA provides that repair or compensation are "the sole and exclusive remedies" for subsidence damage unless "the trier of fact finds[ ] intentional, willful, or wanton conduct." Ala. Admin. Code § 9-19-71(f). Conduct in "substantial compliance with applicable mining permits may not be deemed to be intentional, willful, or wanton." *Id.*

In sum, based on that statutory and regulatory framework, Plaintiffs may recover only the costs to repair material damage or to compensate them for material damage, and only from the mining permittee (in this case, Oak Grove), unless they can prove that the Oak Grove and/or

Cliffs engaged in intentional, willful, or wanton conduct.

The parties filed cross-motions for partial summary judgment. Defendant Oak Grove concedes that, as the mining permittee, it is obligated under Alabama law to repair material damage to Plaintiffs' homes or compensate them for material damage. But it disputes Plaintiffs' valuation of the damage to their homes. By contrast, Cliffs contends that it is not the mine permittee, so Plaintiffs cannot recover from it because they have not presented any evidence creating a genuine issue of material fact that it engaged in intentional, willful, or wanton conduct. Likewise, Oak Grove contends that Plaintiffs presented no evidence introducing a genuine dispute of material fact that it engaged in intentional, willful, or wanton conduct.

Plaintiffs, in turn, contend that they are entitled to summary judgment because no genuine dispute of material fact exists about the value of the subsidence damage to their houses or about whether Defendants committed intentional and willful acts that were not in substantial compliance with their mining permits.

The summary judgment motions have been fully briefed. (Docs. 68, 72, 74, 75, 77, 80). For the reasons stated in this Memorandum Opinion, the court **WILL GRANT** Defendants' "Motion for Summary Judgment" and **WILL DENY** Plaintiffs' "Motion for Partial Summary Judgment." The court finds that no evidence supports a finding that Oak Grove did not substantially comply with its mining permit; that no evidence supports a finding that Cliffs directed Oak Grove's mining activities; and that the sole issue on which a genuine dispute of material fact exists is the amount of damages Plaintiffs should recover from Defendant Oak Grove under § 9-16-91(e) of ASMCRA. The partes also filed motions to strike certain

evidentiary submissions and responses to those motions. (Docs. 73, 76, 78, 79, 81, 82). The court **WILL GRANT IN PART AND DENY IN PART** Plaintiffs' motion to strike part of G. Milton McCarthy, Jr.'s affidavit, **WILL DENY** Defendants' motion to strike parts of Plaintiffs' affidavits, and **WILL DENY** Plaintiffs' motion to strike references to the Jefferson County Tax Assessor's valuations of their homes.

## II. MOTIONS TO STRIKE

Before setting forth the factual record, the court considers the parties' motions to strike certain evidentiary submissions.

### A. Plaintiffs' Motion to Strike Parts of G. Milton McCarthy, Jr.'s Affidavit

Plaintiffs move to strike parts of Deputy Attorney General G. Milton McCarthy, Jr.'s affidavit. Those parts involve Mr. McCarthy's discussion of the Oak Grove Mine; his testimony about Alabama Surface Mining Commission ("ASMC") requirements and procedures; and his opinion that Oak Grove substantially complied with its ASMC permit terms, which would preclude a finding of intentional, willful, or wanton conduct under ALA. CODE § 9-16-91(f). Plaintiffs move to strike on the grounds that (1) these portions of the affidavit constitute expert testimony and Defendants failed to designate Mr. McCarthy as an expert witness; (2) Mr. McCarthy's opinion testimony violates the Alabama Attorney General's policy against offering opinions on behalf of private litigants; (3) the mid-term permit review on which Mr. McCarthy partially relies for his opinion that Defendants were in substantial compliance with their mining permit does not support his opinion; and (4) Mr. McCarthy's opinion testimony otherwise lacks factual support.

4

Defendants put Mr. McCarthy forward as a lay witness. His affidavit must, therefore, comply with the requirements under Federal Rule of Evidence 701 for lay witnesses offering opinion testimony. Mr. McCarthy's testimony is limited to those opinions that are "rationally based on [his] perception," "helpful to clearly understanding [his] testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of [Federal] Rule [of Evidence] 702." FED. R. EVID. 701. And "[t]he evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

Mr. McCarthy heads the Legal Division of the ASMC and in this capacity is "responsible for representing the ASMC in both federal and state courts as well as managing the legal and enforcement section of the ASMC." (Doc. 68-16 at 3 ¶ 2). His affidavit concerns the matters regulated by that commission. Thus, the portions of his affidavit that are based entirely on Mr. McCarthy's personal knowledge and consist of factual statements or discuss the requirements of the statutory and regulatory framework governing subsidence mining in Alabama, or the ASMC's interpretation and administration thereof, are admissible. *See* FED. R. EVID. 701; *Langenbau v. Med-trans Corp.*, 167 F. Supp. 3d 983, 1006 (N.D. Iowa 2016) (noting that restraints on expert testimony do not prohibit lay witnesses from discussing "the contents of regulations applicable to a regulated industry in which they work . . . if they have sufficient personal knowledge of the existence and contents of those regulations"); *Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1115 (N.D. Cal. 2014) (ruling that employee of federal agency could testify as a lay witness as to grant procedures of the agency and specific grant applications in evidence, but could not offer legal conclusions).

But witnesses may not offer legal conclusions. *See, e.g.*, *Arvignan*, 932 F.3d at 1577. Mr. McCarthy's affidavit breaks that rule in two places. First, his statement in paragraph 16 that "Oak Grove's longwall mining and subsidence of plaintiffs' properties was 'conducted in substantial compliance' with its ASMC permit pursuant to Ala. Code § 9-16-91(f)" is tantamount to a legal conclusion that Defendants' conduct was not intentional, willful, or wanton, because it mirrors the language in Ala. Admin. Code § 9-19-71(f) setting out the standard for intentional, willful, or wanton conduct. (Doc. 68-16 at 6 ¶ 16); *see Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015) (quoting *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) ("If testimony 'track[s] the language of the applicable statute' or uses a term that 'has a specialized legal meaning that is more precise than the lay understanding of the term,' the testimony is an impermissible legal conclusion.")).

Second, Mr. McCarthy attests that "*In compliance with ASMC regulations*, Oak Grove's subsidence control plan identified by name and location the known surface owners under which it planned to mine, subside and potentially damage."(Doc. 68-16 at 6 ¶ 12 (emphasis added)). The first clause of that sentence—"In compliance with ASMC regulations"—is also tantamount to an impermissible legal conclusion. The court **WILL STRIKE** the first clause in paragraph 12 and the entirety of paragraph 16.

Mr. McCarthy also makes some assertions for which he does not establish he has personal knowledge. The court **WILL STRIKE** the first three sentences of paragraph 8 and the second sentence of paragraph 10 of Mr. McCarthy's affidavit for that reason. The court **WILL STRIKE** the second paragraph of paragraph 10 for the alternative reason that Mr. McCarthy has not been qualified as a mining expert competent to testify as to longwall mining's results generally. *See*

FED. R. EVID. 702 (providing that a qualified expert witness may provide an opinion where the testimony is "based on sufficient facts or data" and "the product of reliable principles and methods," in addition to meeting other requirements).

Having struck Mr. McCarthy's opinion about Oak Grove's substantial compliance with its permit, the court need not address whether Mr. McCarthy provided factual support for that opinion. And because this court is not tasked with enforcing the laws and policies governing the office of Alabama Attorney General, and Alabama law setting forth the Attorney General's duties does not constitute federal evidentiary law, the court also does not reach the question of whether Mr. McCarthy provided his opinion in violation of any prohibitions on Attorney General opinions on behalf of private litigants.

The court **WILL GRANT** Plaintiff's Motion to Strike the second sentence of paragraph 10 and the entirety of paragraph 16 and **WILL DENY** the Motion to Strike as to paragraphs 3, 7, 8, 14, and 15. The court also **WILL STRIKE** the first three sentences of paragraph 8 and the first clause of the first sentence in paragraph 12.

### B.     Defendants' Motion to Strike Portions of Plaintiffs' Affidavits

Defendants move to strike four paragraphs that are substantially identical across seven Plaintiffs' affidavits. (Docs. 70-2 through 70-8 at ¶¶ 3, 5, 9–10). Defendants contend that the statements in those paragraphs, which express Plaintiffs' beliefs that their homes are total losses because of the damage incurred from Defendants' mining activities, contradict individual Plaintiffs' previous deposition testimony and are impermissibly speculative.

Plaintiffs assert in their affidavits:

> As the owner of the real property, I testify that my home and its

surrounding land would be worth [dollar amount—varies among Plaintiffs] today if it had not been damaged by subsidence. I base this testimony on the amount I originally paid for my home, the number of years we have owned the home, and the prices of other similar houses in the area that were not damaged by subsidence. . . . I testify that my home has no value in its current condition because I cannot sell it with such significant subsidence damage to it.

(Docs. 70-2 through 70-8 at ¶¶ 5, 9).

To the extent that Plaintiffs' affidavits express Plaintiffs' opinions about the values of their homes, the affidavits do not contradict earlier deposition testimony in which Plaintiffs expressed *no* opinion as to the values of their homes. Facing a similar issue, Judge Steele held: "That [Plaintiff] may have had no idea what her property was worth at the time of her deposition . . . does not necessarily negate the possibility that she undertook to formulate such opinions prior to completing the [later] affidavit." *Fisher v. Ciba Specialty Chemicals Corporation*, No. 03-0566-WS-B, 2007 WL 2995525, at *4 (S.D. Ala. Oct. 11, 2007).

Nor do the statements at issue constitute impermissible speculation. Judge Steele persuasively addressed a nearly identical situation in the *Fisher* case, admitting affidavits in which homeowners opined as to their properties' value "based on decades of residing there." 2007 WL 2995525, at *7. The court held that to exclude the affidavits would reject both Alabama and federal law holding that a landowner may testify as to his own land's value. *Id.*

The affiant Plaintiffs here similarly and properly base their valuations on their own knowledge of *their* properties. Thus, the court **WILL DENY** Defendants' Motion to Strike.

### C. Plaintiffs' Motion to Strike References to Jefferson County Tax Assessor's Information

Plaintiffs move to strike Defendants' submission of the Jefferson County Tax Assessor's

8

valuations of Plaintiffs' homes. (Docs. 75-2 and 75-3). Plaintiffs argue that the Tax Assessor's valuations (1) constitute expert testimony not properly disclosed in advance, and (2) are inaccurate.

The tax records do not constitute testimony by an expert witness and are admissible as certified copies of public records under Federal Rule of Evidence 902(4). *See Simek v. J.P. King Auction Co.*, 160 F. App'x 675, 685–86 (10th Cir. 2005) (holding that property assessment by county tax assessor was admissible under Rule 902(4) and that it did not constitute a "back door" expert opinion: "The fact that such a tax record is relevant for this purpose [of determining the property's value] does not automatically subject the record to *Daubert* analysis where the record is admissible on other grounds and there is no attempt to characterize the tax record as anything other than what it is.").

The property tax assessments present one factor relevant to determining the value of Plaintiffs' homes, and the Federal Rules do not otherwise prohibit their admission. *See* FED. R. EVID. 401(a) (providing that evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence"); FED. R. EVID. 402 (providing that relevant evidence is admissible unless specified federal law provide otherwise). Plaintiffs' challenge to the *accuracy* of the tax assessments goes to the weight, rather than the admissibility, of the evidence. The court **WILL DENY** Plaintiffs' Motion to Strike.[1]

## III.    STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of

---

[1] Though the court declines to strike the tax assessments, the court does not rely on them in making its determination as to whether any party is entitled to summary judgment.

material fact are present and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Id.*

In reviewing the evidence submitted, the court must view all evidence and factual inferences drawn from it in the light most favorable to the non-moving party. *See Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (citation omitted). However, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citation omitted).

The filing of cross motions for summary judgment does not affect the applicable Rule 56 standard. *See, e.g.*, *United States v. Oakley*, 744 F.2d 1553, at 1555–56 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).[2] When parties file cross motions for summary judgment, "each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law." *Busby v. JRHBW Realty, Inc.*, 642 F. Supp. 2d 1283, 1288 (N.D. Ala. 2009) (citations omitted). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact . . . does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *Id.* at 1289 (quoting 10A ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327–28 (3d ed. 1998)).

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

The Eleventh Circuit has noted that "[c]ross motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Oakley*, 744 F.2d at 1555 (quoting *Bricklayers*, 512 F.2d at 1023). Nevertheless, "cross-motions may be probative of the non-existence of a factual dispute when . . . they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." *Id.* at 1555–56 (quoting *Bricklayers*, 512 F.2d at 1023).

## IV.    STATEMENT OF FACTS

Each of the Plaintiffs owns a home and real property in the Cross Creek subdivision in Jefferson County, Alabama. Defendant Oak Grove operates the Oak Grove Mine near Adger, Alabama, and employs the longwall method of mining, a kind of underground mining that results in subsidence of the surface land above the mined areas.[3] Plaintiffs' properties were damaged by subsidence caused by longwall mining at Oak Grove Mine. Plaintiffs filed this lawsuit on April 4, 2014.

### A.    Alabama Mining Permitting and Permit for Oak Grove Mine

The statutory and regulatory framework governing underground coal mining in Alabama, implemented by both the federal and Alabama governments, among other things, requires that the Alabama Surface Mining Commission ("ASMC") issue a permit for any coal mining operation in the state. *See* ALA. CODE § 9-16-82(a). To obtain a permit, a coal mining operator

---

[3] The court notes that it will strike, and thus must not rely on, Mr. McCarthy's statement that "Longwall mining results in planned and controlled subsidence of the surface above the mine." (Doc. 68-16 at 5 ¶ 10). But the parties dispute neither the fact that Oak Grove engages in longwall mining nor the fact that longwall mining causes subsidence.

must disclose to the ASMC—and the ASMC must approve—a detailed mining operation plan that includes the names and locations of all affected surface owners. *See* ALA. CODE §§ 9-16-83(b), 9-16-85. ASMC regulations further require that a mine operator whose operations may produce subsidence causing material damage to, or diminution in the value or reasonably foreseeable use of, occupied residential dwellings submit a detailed subsidence control plan as part of its permit application. ALA. ADMIN. CODE r. 880-X-8i-.10. When the ASMC issues a permit and the operator begins mining, the operator must comply with certain performance standards. *See* ALA. ADMIN. CODE r. 880-X-10c-.01 *et seq.*

An Alabama mining permittee must conduct operations "only as described in the approved application," unless the ASMC instructs otherwise; must comply with all terms and conditions of its permit; and must satisfy all statutory and regulatory requirements. ALA. ADMIN. CODE r. 880-X-8K-.11. The ASMC must review every permit before the midpoint of its term to ensure that the permit complies with all statutory and regulatory requirements, and may require revision or modification of the permit provisions if necessary. *See* ALA. ADMIN. CODE r. 880-X-8M-.05. The ASMCRA provides for penalties and other remedies for violations of a permit, including permit suspension or revocation upon a willful or unwarranted "pattern of violations of any requirements of this article or any permit conditions . . . ." *Id.* at § 9-16-94(d); *see id.* at § 9-16-93.

Oak Grove Resources holds an ASMC permit for the Oak Grove Mine, most recently issued on February 10, 2013. Oak Grove has submitted to the ASMC, and the ASMC has approved, various versions of its subsidence control plan. The ASMC approved an updated version of the subsidence control plan in 2014. That plan included the names and locations of

property owners who its planned mining operations potentially would affect. The affected property owners in the subsidence control plan included the Plaintiffs, beneath whose property Oak Grove mined between late 2013 and some time in 2014.

In addition, the ASMC regularly inspects the Oak Grove Mine. The ASMC completed a mid-term permit review of Oak Grove's permit in 2015, after Oak Grove completed the mining that affected Plaintiffs' properties. As part of that review, an ASMC inspector concluded that all conditions at the mine, including the operation plan, grading, and topsoil variance, were satisfactory.

Scott Crafton, Oak Grove's District Land Manager, testified that compliance with Oak Grove's mining permit requires Oak Grove to obey all applicable federal and state mining laws and regulations. All Plaintiffs testified that they had no reason to believe that Oak Grove mined beneath or near their properties in a manner not in compliance with its permit and/or that they did not know whether the mining was compliant.[4]

## B.      Preparations for Mining Beneath Plaintiffs' Properties

Oak Grove retained a geotechnical engineer, Mr. Lewis, to assess the anticipated subsidence at Plaintiffs' properties. Mr. Lewis's report, dated September 5, 2013, projected specific subsidence amounts for Plaintiffs' properties and others affected by the mining. The projected subsidence at Plaintiffs' properties collectively ranged from .25 feet to 2.4 feet.

---

[4] Plaintiff Anjanette Widener was the only one to come close to asserting that Oak Grove was not complying with its permit. While stating that she was unsure whether Oak Grove mined in noncompliance with its permit, she testified that she felt that Oak Grove was noncompliant because her "house is destroyed" and she questioned whether Oak Grove could have done things differently to prevent that outcome. (Doc. 68-13 at deposition 35:5). She further testified that she believed Oak Grove was noncompliant but that she lacked the knowledge and expertise to say what measures Oak Grove could or should have taken. (*Id.* at lines 20–23).

Oak Grove's subsidence control plan provides that Oak Grove "will undertake protective measures for . . . occupied residential dwellings"; those measures "may include . . . [t]renching around structures which have basements" and "[s]evering structures at locations sensitive to differential settlement such as retaining walls joined to structures, breezeways or rigid members such as slabs or major additions." (Doc. 68-16 at ECF 24). Oak Grove neither trenched around Plaintiffs' homes nor severed structures at locations sensitive to differential settlement at their properties.

Mr. Crafton sent letters to the Plaintiffs in June 2013 on behalf of Oak Grove, informing them that Oak Grove's planned underground mining could cause the surface of their properties to subside. Mr. Crafton testified that he knew that the land beneath the Plaintiffs' homes had previously been strip-mined and reclaimed prior to Oak Grove's mining operations; that he had never before been involved in underground mining operations involving land that was previously strip-mined; and that, though he was unsure of the effect previous strip-mining would have on the amount of subsidence produced by the underground mining, geotechnical engineer Mr. Christopher Lewis had informed him during consultation that the prior mining would not affect subsidence.

Kristie Baggett serves as a land administrator for Oak Grove. She testified: "I don't think anybody really knew what to expect" regarding the effects of underground mining involving a previously strip-mined area. (Doc. 70-13 at deposition 91:23–92:1). She noted that Mr. Lewis "was not really concerned with" the fact that the area had previously been strip-mined, and that "[h]e did not think there would be a drast [sic] difference like a lot of people were concerned about." (*Id.* at deposition 91:1–4).

The Plaintiffs, who provided affidavits addressing mitigative measures (one Plaintiff per affected home), maintain that Defendants did not tell them about any of the protective measures identified in the subsidence plan. They also explain that, while Oak Grove took various individualized steps, depending on the home, to prepare their properties for Oak Grove's mining, these measures were insufficient to prevent or mitigate mining damage. Plaintiff Greg Nolan avers, for example, that "[t]he mining company did add flimsy metal straps to the floor joists under the 1st floor of our home, and they did loosen the dirt around the pipe running from our septic tank to the home, but that is all they did before they started mining under our home." (Doc. 70-2 at 2 ¶ 8). During their depositions, these Plaintiffs similarly described the measures Oak Grove took to prepare their homes for the mining, such as installing wooden bracing.

In response to a letter of complaint from the Widener Plaintiffs, the ASMC wrote to them:

> During the pre-subsidence survey, the structural engineer and contractor decide on the appropriate mitigative measures and materials to be used to minimize material damage to your home to the extent technologically and economically feasible. It is possible that more rigid materials, such as steel beams, may cause more harm than good and other materials may be more suitable to minimize material damage. Qualified structural engineers and contractors should be able to determine the appropriate measures to be taken to minimize damage.

(Doc. 75-10 at ECF 3).

### C. Measuring Subsidence and Damage at Plaintiffs' Properties

Prior to mining, Oak Grove placed survey markers throughout the Plaintiffs' subdivision. Oak Grove took subsidence measurements at all survey markers before beginning mining, in July

2012; at almost every survey marker except those nearest the Plaintiffs' properties in July 2014 (after Plaintiffs filed this suit); and at every survey marker except those nearest the Plaintiffs' properties in October 2015, after the conclusion of mining. By agreement of the attorneys, a surveyor for Oak Grove took subsidence measurements at Plaintiffs' properties between late March and early May 2016.

Oak Grove's 2014 update to its subsidence control plan estimated maximum structure subsidence at affected properties. That Plan provides: "The actual subsidence experienced at any location will vary from the estimated magnitudes reported below due to abnormalities of geology (e.g., faults), topography (e.g., steep and/or varied terrain), mine conditions, mining rate, gate behavior, and structure footprint, among other factors." (Doc. 68-16 at ECF 39). Actual subsidence at survey markers nearest two of the properties at issue was 32.5% higher than estimated (estimated: 2.4 feet; actual: 3.18 feet).

Letters from the ASMC in response to several Plaintiffs' complaints about the damage to their homes, dated April 21, 2014, indicate that Oak Grove planned to perform a post-mining inspection at their homes in late April/early May 2014. Those letters explain that "subsidence on the surface is essentially complete approximately 120 days after longwall mining beneath a particular area." (E.g., Doc. 75-5 at ECF 2). Some Plaintiffs testified that Oak Grove sent them letters asking to schedule post-mining inspections of their homes. Gregory Nolan testified that "upon [his] attorney's instruction," he did not schedule the post-mining inspection of his home; Plaintiff Christopher Pappas testified that he did not schedule the post-mining inspection of his home. (Doc. 68-3 at deposition 88:21–89:9).

On unopposed requests by the Defendants, this court stayed litigation in July 2014 and

continued the stay until July 2015 to allow Defendants to complete mining, to permit subsidence to settle, and to allow time for post-mining inspections. According to the parties' Joint Status Report of April 30, 2015, Oak Grove had proposed conducting post-mining inspections in April 2015 after completing mining in November 2014, but Plaintiffs requested more time to ensure that subsidence damage was complete. Oak Grove ultimately completed post-mining inspections in December 2015.

Structural engineer Ron Martin of Martin Structural Services conducted pre- and post-mining inspections of Plaintiffs' homes and compiled reports summarizing the findings of these inspections. Lee Williams, Defendants' repair expert, estimated the costs of repairs to the Plaintiffs' homes based on the post-mining reports. Mr. Williams estimated that repair costs would range between $36,160.00 and $94,762.00 per home.

Kenneth Hays, the Plaintiffs' repair cost expert, personally examined each of the Plaintiffs' homes and estimated that repairs would cost substantially more; his estimates ranged from $75,100.00 to $287,500.00 per home. A member from each of the Plaintiffs' families averred that his or her home was a total loss based on the amount of damage to the home and that it could not be sold to a third party because of the need for extensive subsidence-related repairs.

Defendants have not made any repairs to Plaintiffs' homes or otherwise compensated the Plaintiffs for the subsidence damage. Needless to say, the parties dispute the amount and extent of damages due the Plaintiffs.

### D. Pre-Mining "Subsidence Program" and Repair & Sale of Damaged Homes

Oak Grove offered a pre-mining "Subsidence Program" to homeowners potentially affected by the mining under Plaintiffs' subdivision. Under the program's terms, Oak Grove paid

for the required repair or compensation for material damage, plus an "inconvenience payment" that was assessed at 15% of a home's value less the lot value. In return, the homeowner(s) waived any claims against Oak Grove. These 14 Plaintiffs opted not to participate in the Subsidence Program.

Oak Grove purchased seven homes in Plaintiffs' subdivision from owners who participated in the Subsidence Program. In 2016, Oak Grove sold three of those properties—all of which had experienced subsidence damage—to third parties at a loss after it repaired material damage. Oak Grove sold the homes at prices of $146,000; $145,200; and $189,900. Oak Grove took the other four houses off the market.

Ms. Baggett runs Oak Grove's program to repair or purchase damaged homes. But she testified that her responsibilities as to Plaintiffs' homes ceased on or shortly after April 21, 2014, when Defendants' attorneys took over those responsibilities. (Doc. 70-13 at deposition 86:8–10).

### E.    Role of Cliffs Natural Resources, Inc.

Oak Grove Resources, LLC was a wholly-owned indirect subsidiary of Defendant Cliffs Natural Resources, Inc. until Cliffs sold Oak Grove's parent company to Seneca Coal Resources, LLC in December 2015. Cliffs never held the ASMC mining permit.

Cliffs's 2013 and 2014 Form 10-K filings with the United States Securities and Exchange Commission stated that Cliffs directly owned and operated Oak Grove Mine. Both reports include the following language: "References in this report to the 'Company,' 'we,' 'us,' 'our' and 'Cliffs' are to Cliffs Natural Resources Inc. and subsidiaries, collectively." (Doc. 70-36 at ECF 8; Doc. 70-40 at ECF 7).

A September 5, 2013 letter from geotechnical engineer Mr. Lewis to Mr. Crafton was

addressed to "Mr. Scott Crafton, District Manager – Land Administration, Cliffs Natural Resources," at a Bessemer, Alabama address. (Doc. 72-4 at 1). Mr. Crafton and Mr. Lewis had worked together for 20 years at that time and knew each other well.

Mr. Crafton and Ms. Baggett testified that they worked at the Oak Grove Mine. Both Mr. Crafton and Ms. Baggett also testified that before Seneca bought the mine, they were unsure whether their paychecks came from Oak Grove or Cliffs, and that they did not know which entity they listed as their employer on their tax returns. Both Mr. Crafton and Ms. Baggett had Cliffs email addresses (e.g., "@cliffsnr.com"). (Doc. 70-9 at deposition 37:23–38:5).

The Cliffs logo appears on letters to the Plaintiffs, above one of the following headings, depending on the letter:

> CLIFFS NATURAL RESOURCES INC.
> Oak Grove Resources LLC
> 8500 Oak Grove Mine Road, Adger, AL 35006
> P 205.497.3600 F 205.497.3506 cliffsnaturalresources.com
>
> CLIFFS NATURAL RESOURCES INC.
> Oak Grove Resources, LLC
> 8350 Taylors Ferry Road, Hueytown, AL 35023
> P 205.438.7100 F 205.438.7104 cliffsnaturalresources.com

(Docs. 70-10 and 70-11). These letters to Plaintiffs identify Oak Grove as the mine operator and the entity responsible for repairs.

## V.    ANALYSIS OF MOTIONS FOR SUMMARY JUDGMENT

Both parties move for summary judgment in their favor as to liability for wanton, intentional, and willful conduct by both Defendants. Plaintiffs additionally move for summary judgment as to the remedy they are due under § 91(e) of ASMCRA, and Defendants move for summary judgment as to the sole remaining claim against Cliffs Natural Resources and as to all

19

remaining claims against Oak Grove other than the remedy due under § 91(e).

A.     **Claim Against Cliffs Natural Resources**

Plaintiffs assert a single claim against Cliffs: that Cliffs is liable for wanton, intentional, or willful conduct for directing Oak Grove Mine's mining activities.  But Plaintiffs have not presented any evidence supporting that assertion. All the evidence shows is that Cliffs was Oak Grove's parent company. "A parent corporation which owns all the stock of a subsidiary corporation is not liable for acts of its subsidiary corporation, unless the parent corporation so controls the operation of the subsidiary corporation as to make it a mere adjunct, instrumentality, or alter ego of the parent corporation." *Ex parte Baker*, 432 So. 2d 1281, 1284 (Ala. 1983) (citations omitted).

No evidence shows that Cliffs operated Oak Grove Mine so as to make Oak Grove its instrumentality or alter ego. That Oak Grove employees included parent company information in letter headings, used parent company addresses to send and receive email, or even received paychecks from a parent company does not indicate Cliffs's direction of operations but merely its ownership. *Accord Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995) (holding that the inclusion of descriptions of the parent-subsidiary relationship and the parent company's logo in the subsidiary's promotional literature did not justify piercing the corporate veil to reach the parent); *Preferred Real Estate Invs., LLC v. Lucent Techs.*, No. 07-CV-5374, 2009 WL 1748954, at *4–5 (D.N.J. June 19, 2009) (finding that "common ownership, a common principal place of business, . . . [and] common e-mail addresses, e-mail signatures, and corporate letterhead" did not warrant piercing the corporate veil). Nor does Mr. Crafton's receipt of a letter from Mr. Lewis, addressing Mr. Crafton as though he were employed by Cliffs, establish Cliffs's

direction of Oak Grove's mining operations.

Accordingly, Cliffs is entitled to summary judgment as to the sole remaining claim against it—the allegation of wanton, intentional, or willful conduct in Count II.

### B. Count II: Wanton, Intentional, and Willful Conduct

Plaintiffs allege in Count II of their Amended Complaint that Oak Grove engaged in wantonly, willfully, or intentionally harmful mining activities. Section 91(f) of ASMCRA provides that "conduct in **substantial compliance** with applicable mining permits may **not** be deemed to be intentional, willful, or wanton." ALA. CODE § 9-16-91(f) (emphasis added). Thus, disposition of this count turns on whether Oak Grove's conduct substantially complied with Oak Grove Mine's permit.

No binding authority defines "substantial compliance" or interprets the phrase in the context of the ASMCRA. Plaintiffs point out that the federal Office of Surface Mining Reclamation and Enforcement ("OSM"), which must approve changes to Alabama's surface mining program, interprets § 9-16-91(f)'s use of "substantial compliance" with a permit to mean "compliance with all rules, regulations, orders, and permits." Approval of Alabama Regulatory Program Amendments, 65 Fed. Reg. 36,328, 36,329 (June 8, 2000) (codified at 30 C.F.R. 901.15). The court finds that the OSM's interpretation, with which Oak Grove's District Land Manager apparently concurs, presents a fair and accurate—although incomplete—reading: it does not clarify what distinguishes *substantial* compliance from mere compliance.

The court need not define the precise contours of what would constitute substantial compliance, however, because the record demonstrates that Oak Grove fully complied with the terms of its permit and all applicable statutes and regulations. The ASMC regularly inspected

Oak Grove Mine, and at the mid-term permit review, the ASMC's inspector found that all conditions at the mine were satisfactory. The evidence does not reveal that the ASMC has ever found that Oak Grove violated its permit. The court finds it reasonable to infer that had Oak Grove, in mining beneath the Plaintiffs' properties, failed to comply with the terms of its permit; failed inspection or a specific performance standard; or otherwise fallen short of the requirements of the legal framework governing mining in Alabama, the ASMC would have addressed the violation in some way and/or reflected it in the mid-term permit review. And Defendants point out that Plaintiffs admitted to having no knowledge that Defendants failed to comply with the mining permit.

Plaintiffs first argue that Oak Grove did not substantially comply with the permit because it violated the ASMCRA's requirement that the permittee *promptly* repair or compensate them for damage to their homes. The OSM defines "prompt" in the context of "timely repair or compensation of protected structures" as "expeditious or immediate." Discussion of Final Amendments to Regulations Governing Underground Coal Mining and Subsidence Damage, 60 Fed. Reg. 16,722, 16,735 (Mar. 31, 1995) (regulation codified at 30 C.F.R. 817.121). The OSM also opines that "what is reasonably prompt for repair or compensation is properly determined on a case-by-case basis." (*Id.*)

The court finds that, *on the facts of this individual case*, Oak Grove has not failed to promptly repair or compensate Plaintiffs for the damage to their homes. Though the parties dispute precisely when in 2014 mining ended, Plaintiffs filed this suit in early April 2014. Oak Grove originally did not plan to conduct post-mining inspections of Plaintiffs' homes until late April or early May 2014 at the earliest, based on the time required for subsidence effects to settle.

Those inspections were delayed, in part, by the filing of this lawsuit; by the stay entered on consent and then at the request of the Plaintiffs; and, at least in some cases, by Plaintiffs's decisions (in one instance at the direction of counsel)[5] to not schedule the inspections.

The Plaintiffs cannot reasonably expect Oak Grove to "promptly" repair their homes or compensate them for damage when they filed suit and delayed the inspections necessary for Oak Grove to evaluate the nature and extent of the damage. The court emphatically declines to hold that a plaintiff may sue a mining operator to recover for subsidence damage and then, if the litigation proceeds beyond a time period that might normally be considered prompt for purposes of repair or compensation without litigation, successfully argue that the operator failed to fulfill its legal obligations. Further, Oak Grove's remedial action requires a decision on whether repair or compensation is the appropriate remedy and, second, on what repairs are necessary or the amount of compensation required. The parties here do not agree on either of these questions.

And the ways in which Oak Grove treated these Plaintiffs differently from other homeowners whose homes were damaged by the subsidence do not demonstrate that Oak Grove failed to promptly repair or compensate these Plaintiffs. Plaintiffs point to Oak Grove's failing to take subsidence measurements at the survey markers closest to Plaintiffs' homes in July 2014 and October 2015, and to its purchasing seven homes whose owners participated in the Subsidence Program.[6] When Plaintiffs engaged counsel to represent them and filed this litigation,

---

[5] Doc. 68-3 at deposition 88:21–89:9.

[6] Oak Grove's Subsidence Program is not, as Plaintiffs contend, a "nefarious" bait-and-switch under which homeowners who participate are duped into waiving their claims against Oak Grove in return for a prompt payout and those who choose not to participate are denied their due remedy. (Doc. 70-1 at ECF 27; Doc. 72 at ECF 26). Rather, the existence of the Program suggests that Oak Grove recognized that affected homeowners might suffer damages above and

Oak Grove could not longer deal with them directly, and all contact with Plaintiffs and their property had to be through counsel.  By agreement of the attorneys, Oak Grove's surveyor eventually took subsidence measurements at Plaintiffs' properties between March and May of 2016.

The only reasonable inference the court may draw from these facts is that Plaintiffs were treated differently because they filed this lawsuit—and they filed this lawsuit because they disagreed with Oak Grove as to what damages they were entitled under Alabama law. Oak Grove could not repair the damage to Plaintiffs' homes or compensate them for that damage while it is still litigating the nature and amount of its liability to Plaintiffs. Ms. Baggett's testimony that Defendants' attorneys took over her responsibilities regarding "post-mining inspections, loss of value, or repair costs" as to Plaintiffs' homes shortly after Plaintiffs filed suit supports this conclusion. (Doc. 70-13 at deposition 86:8–10).  And so does the evidence that two of the plaintiffs refused to schedule post-mining inspections of their homes, one on the advice of his attorney.

Second, in support of their position that Defendants' conduct did not substantially comply with the Oak Grove Mine permit, Plaintiffs point to the fact that Oak Grove neither trenched around Plaintiffs' homes nor severed structures at locations sensitive to differential settlement at their properties. They submit the Alabama Mining Code's requirement that "*[i]f* a permittee

---

beyond those covered by repair and compensation, and sought to avoid litigation by compensating those owners up front. In return, homeowners who chose to participate gave up their right to sue Oak Grove, but were assured a significant sum of money to which they may or may not be entitled under the ASMCRA scheme. In any event, the existence of the Subsidence Program, and Oak Grove's purchase of seven homes of owners who participated in it, does not establish that Oak Grove did not promptly repair or compensate these Plaintiffs who engaged counsel to represent them and sought damages via litigation.

employs mining technology that provides for *planned subsidence* in a predictable and controlled manner, the permittee must take necessary and prudent measures, consistent with the mining method employed, to minimize material damage to the extent technologically and economically feasible to . . . occupied residential dwellings . . . ." ALA. ADMIN. CODE r. 880-X-10D-.58(1)(b) (emphasis added).[7]

But Plaintiffs have failed to demonstrate that Oak Grove did not take "necessary and prudent measures . . . to minimize material damage to the extent technologically and economically feasible . . . ." *See* ALA. ADMIN. CODE r. 880-X-10D-.58(1)(b). Rather, they assume, without evidence, that two of the *possible* preventative measures identified in Oak Grove's subsidence control plan were (a) "necessary and prudent" to minimize "*material damage*" as to *all seven* of the Plaintiffs' homes, and (b) technologically and economically feasible. Plaintiffs have failed to identify why the trenching and severing activities to which they point, or any other possible mitigative measures Oak Grove did not utilize, were necessary and prudent to minimize material damage to their homes.[8] And per the ASMC's letter to the

---

[7] Elsewhere in briefing, Plaintiffs dispute that Oak Grove's subsidence was planned. But this provision requires planned, not unplanned, subsidence for its application; Plaintiffs cannot have it both ways. Moreover, the ASMCRA explicitly recognizes that longwall mining results in "planned subsidence." *See* ALA. CODE § 9-16-91(f).

[8] Plaintiffs argue in their Reply brief that "Defendants failed to produce any reports (scientific or otherwise) . . . that such methods were examined by the Defendants but not feasible or likely to help the situation." (Doc. 77 at ECF 5). True. But the court finds that Defendants have met their summary judgment burden to show that Oak Grove substantially complied with the terms of its mining permit by submitting evidence that the Oak Grove Mine passed a mid-term permit review after mining under these Plaintiffs' properties finished and by pointing to a lack of evidence of non-compliance. Plaintiffs have failed to rebut that showing by, for example, producing their own scientific or expert reports demonstrating that certain mitigative measures were (1) necessary and prudent to prevent material damage **and** (2) technically and economically feasible *at Plaintiffs' homes*. Accordingly, Plaintiffs have also failed to meet their burden on

Wideners, the ASMC recognizes that mitigative measures are properly chosen on a property-by-property basis by the expert engineers and contractors who assess the individual properties.

Finally, Plaintiffs argue that the Oak Grove did not substantially comply with the Oak Grove mining permit because the mining caused more subsidence than the Defendants had projected it would cause. In support, they point to Mr. Crafton's unfamiliarity with mining beneath an area that had previously been strip-mined and Ms. Baggett's comment that "I don't think anybody really knew what to expect" regarding the effects of underground mining involving a previously strip-mined area. (Doc. 70-13 at deposition 91:23–92:1.) Plaintiffs additionally note the discrepancy between the estimated and actual subsidence levels at two survey markers near Plaintiffs' homes.

But Oak Grove hired an expert to assess anticipated subsidence and did not rely on Mr. Crafton or Ms. Baggett. Mr. Crafton and Ms. Baggett both testified that Oak Grove's consulting geotechnical engineer, Mr. Lewis, opined before mining began that the fact that the land beneath Plaintiff's properties had previously been strip-mined and reclaimed would not significantly impact subsidence. And Mr. Lewis's subsidence projections were just that—projections that could vary based on numerous factors. His report makes clear that the precise subsidence levels could not be ascertained beforehand. Plaintiffs have produced no evidence indicating that Mr. Lewis's estimation methods were flawed or explaining why his projections were faulty.

Because no evidence supports a finding that Oak Grove engaged in conduct that did not

summary judgment to show that Oak Grove did not substantially comply with its permit by violating regulation 880-X-10D-.58(1)(b).

substantially comply with the Oak Grove mining permit, Plaintiffs may not recover damages for any wanton, intentional, or willful conduct, including those for mental anguish or emotional distress or punitive damages. They are entitled solely to the remedies provided in ASMCRA's section 91(e).

### C.   Repair or Compensation Remedy Under Alabama Code § 9-16-91(e)

Oak Grove readily admits its responsibility under § 9-16-91(e) to repair material damage to Plaintiffs' homes or compensate them for material damage. But it maintains that, given the parties' disagreement both as to the cost of repairing material damage and as to the value of Plaintiffs' properties, the damages question should be submitted to the jury. Plaintiffs move for summary judgment as to the damages they are owed for repair or compensation, arguing that the court should deem their homes total losses and that Oak Grove should compensate them for the value of their homes prior to the subsidence damage.

The court finds that Plaintiffs have not shown that Oak Grove should compensate them for the full value of their homes. First, Plaintiffs assume away the question of whether repair or compensation is the appropriate remedy. Neither Plaintiffs nor Oak Grove have presented a standard for determining how the court is to assess whether a homeowner should receive compensation or repair, and § 91(e) does not detail how a court is to decide between the two remedies.

ASMCRA requires that coal mining operations "[p]romptly **repair** or **compensate** for **material damage** to any occupied residential dwelling and related structures or any noncommercial building caused by surface subsidence resulting from underground coal mining operations." ALA. CODE § 9-16-91(e)(1) (emphasis added). That section provides:

27

> **Repair** of damage shall include rehabilitation, restoration, or replacement of the damaged occupied residential dwelling and related structures or noncommercial building. **Compensation** shall be provided to the owner of the damaged occupied residential dwelling and related structures or noncommercial building which shall be in the full amount of the **diminution in value** resulting from subsidence caused damage.

*Id.* (emphasis added).

No Alabama cases have examined § 9-16-91(e)(1). But a federal district court in West Virginia interpreted a state regulation similar to the statutory provision here. *Schoene v. McElroy Coal Co.*, No. 5:13-CV-95, 2016 WL 6788391 (N.D.W.V. June 9, 2016). That regulation provided that "the mining operator shall 'either correct **material damage** resulting from subsidence caused to any structures or facilities by **repairing the damage** or **compensate** the owner of such structures or facilities **in the full amount of the diminution in value** resulting from the subsidence.'" *Id.* at *2 (quoting W. VA. CODE R. § 38–2–16.2.c.1); *compare* ALA. CODE § 9-16-91(e)(1) (providing that underground coal mining operations must "[p]romptly repair or compensate for material damage to any occupied residential dwelling and related structures . . . caused by surface subsidence resulting from underground coal mining operations," and defining the terms "repair" and "compensation").

That court noted that where the "regulation is silent as to which entity makes the selection of repair or compensation for reduced value,"

> it makes no sense to allow the operator to pick the option which is the cheaper to the company and thus the more unfair to the surface owner. Rather, this Court interprets this section as providing for the repair of the damage to the extent that it is reasonable and feasible with the diminution in value award to the extent that the damage cannot reasonably be repaired.

*Schoene*, 2016 WL 6788391, at *2.

The West Virginia court found significant the fact that "[t]he statutory and regulatory schemes at issue are designed to protect surface owners from the deleterious effects of underground coal mining." *Id.* Faced with the regulation's ambiguity as to which entity should elect compensation or repair, the court "determin[ed] that a regulatory section titled 'Surface Owner Protections' should be interpreted broadly and liberally in favor of the stated goal of providing surface owner protection." *Id.* Thus, the court found, the landowner retained the power to choose between compensation and repair. *Id.*

The West Virginia court found that the regulation at issue in that case "provid[es] for the repair of the damage to the extent that it is reasonable and feasible with the diminution in value award to the extent that the damage cannot reasonably be repaired." *See Schoene*, 2016 WL 6788391 at *2. That states an objective standard for choosing between repair and compensation. That is, if repair is reasonable and feasible, the mining operator repairs the surface owner's property; if repair is *not* reasonable and feasible, then the mining operator must compensate the surface owner for the diminution in the value of his property caused by the subsidence damage.

Such an objective standard conflicts with granting the surface owner the option to choose between repair and compensation. Reading the regulation that way would permit a surface owner whose home was unmarketable *in its damaged state* to always elect compensation for the full pre-subsidence value of his home, even when repairing the damage was a reasonable option.

The court finds persuasive the West Virginia court's conclusion that the mining operator does not get to choose the remedy, but does not find persuasive its conclusion that the surface owner always does. This court declines to hold that Alabama intended to allow surface owners to unilaterally choose the more expensive remedy simply because it means more money in their

pockets. Even if Plaintiffs are correct that their homes, as currently damaged, are worthless, that does not mean that "the damage cannot reasonably be repaired." *See Schoene*, 2016 WL 6788391. And the very fact that Plaintiffs have put forth their own expert to testify as to the cost of repairs indicates that repair is feasible. Further, Plaintiffs' testimony that their homes are total losses is contradicted by the Oak Grove's expert, who provided estimates indicating that the damage to Plaintiffs' homes can be repaired. (*See generally* Doc. 68-24.)

A genuine dispute of material fact remains as to the whether Oak Grove must repair Plaintiffs' homes or compensate them for the material damage done to their homes, and how much Oak Grove owes in repair or compensation. Those issues will proceed to trial.

## VI.    CONCLUSION

For the reasons stated above, the court finds that Plaintiffs may not recover, under Count II, for wanton, intentional, or willful conduct against either Defendant. On the remaining counts, Plaintiffs cannot recover against Defendant Cliffs Natural Resources as a matter of law because Cliffs did not direct Oak Grove's mining operations or otherwise control Oak Grove's operations so as to make it Cliffs's alter ego. And Plaintiffs cannot recover on any of its counts against Oak Grove except for their claim for "repair or compensation" under the ASMCRA's provision. *See* ALA. CODE § 9-16-91(e). But a genuine issue of material fact exists as to the value of the damage Oak Grove must remedy under the "repair or compensation" provision.

Accordingly, the court **WILL GRANT** Defendant's "Motion for Summary Judgment" and **WILL DENY** Plaintiffs' "Motion for Partial Summary Judgment." The court will enter a separate order consistent with this opinion.

**DONE** this 18th day of September, 2017.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE